Merrimack
No. 87-265

## MARK B. RICHARDSON

### v.

## RICHARD A. CHEVREFILS, individually and as Director of the Division of Welfare, & a.

December 12, 1988

*McLane, Graf, Raulerson & Middleton P.A.*, of Manchester (*R. David DePuy* and *Steven V. Camerino* on the brief, and *Mr. DePuy* orally), for the plaintiff.

*Stephen E. Merrill*, attorney general (*Susan S. Geiger*, assistant attorney general, on the brief and orally), for the defendants.

SOUTER, J.   State officials and employees from whom the plaintiff seeks damages under 42 U.S.C. § 1983 appeal the denial by the Superior Court (*DiClerico*, J.; *Mayland H. Morse, Jr.*, Esq., Master) of their motion for summary judgment based on the defense of qualified immunity. We affirm in part, reverse in part, and remand.

From an agreed statement of facts, undisputed allegations, and the master's report, it appears that the plaintiff, Mark Richardson, was employed by the State Division of Welfare from 1977 through October 1983. He was then discharged for what the director of the division termed "inappropriate behavior," and a "major violation of his professional relationship," after the plaintiff was found to have "French-kissed" a fourteen-year-old girl over whom he had responsibility as a social worker. The plaintiff took an appeal to the personnel commission, but prior to its resolution against him, he was hired, in May, 1984, as executive director of the defendant Teen Haven, Inc., a residential home for boys, licensed under RSA chapter 170-E by the State Bureau of Child Care Standards and Licensing.

The plaintiff mentioned his new employment in the course of a hearing on his appeal to the personnel commission the following month. When this information came to the attention of the defendant Roger Desrosiers, a supervisor in the division of welfare, he caused the plaintiff's name to be listed in the State's central registry of perpetrators of child abuse, neglect and exploitation, with a reference to the 1983 incident as "sexual abuse" disclosed by a report that was "founded, prob. resolved." *See* RSA 169-C:35 (Supp. 1983). Our opinion in *Petition of Bagley,* 128 N.H. 275, 280–81, 513 A.2d 331, 335–36 (1986) describes the statutory scheme providing for the central registry, and here it is sufficient to add that a child care facility may not be licensed under RSA chapter 170-E if it employs anyone listed in the registry. *See* N.H. ADMIN. RULES He-C 4002.03(c)(2)(e).

Once the plaintiff's name was listed, an employee of the bureau of child care standards and licensing, the defendant Joan Smith, telephoned the president of Teen Haven's board of directors, the defendant Robert Solomon, whom she informed of the listing and advised that Teen Haven's license under RSA 170-E:3 would not be renewed if the home continued to employ the plaintiff. That same day, the chief of the bureau, the defendant Robert Letellier, wrote Mr. Solomon that "[f]or receipt of license renewal for Teen Haven this month, it is necessary for the facility to come into full compliance [with the regulation prohibiting employment of a person listed in the central registry] within 24 hours of receipt of this letter." The plaintiff was fired and, in listening to Mr. Solomon's explanation, learned for the first time that his name had been placed in the central registry. The listing continued until well after the plaintiff had begun the present litigation, when at last State officials removed the name and acknowledged the plaintiff's right to a hearing prior to any further State action to list his name again.

More than a year after his discharge, the plaintiff brought this action, claiming that the failure to afford him notice and hearing prior to listing his name in the central registry violated rights to procedural due process under both the fourteenth amendment to the National Constitution and part I, article 15 of the Constitution of New Hampshire. He sought a declaration to that effect, an injunction against the continued listing of his name, and monetary damages under 42 U.S.C. § 1983. The complaint also included State law claims for defamation and interference with advantageous contractual relations. For reasons explained below, these common

law counts, like the claims under the State Constitution, are not before us in this appeal.

In addition to the defendants mentioned before, the plaintiff named Sylvio Dupuis, who at the relevant time was the commissioner of health and welfare; Richard Chevrefils, the director of the division of welfare; David Bundy, the director of the division of children and youth services; and Robert Rowe, director of the Dover Children's Home, where the fourteen-year-old girl resided, who is alleged to have "published the inclusion of plaintiff's name on the Central Registry perpetrator's list to employees of the Bureau of Child Care Standards and Licensing and to the Superintendent of the Dover School System." All defendants employed by the State ("the State defendants") were named in both their individual and official capacities, except for the defendant Dupuis, who was sued only as an official representative of the State.

After the defendants had filed their answers, the plaintiff moved for partial summary judgment, to which the State defendants responded with a cross motion raising, *inter alia*, the defense of qualified immunity to the claim for damages under § 1983. On the master's recommendation, the superior court denied each motion. The master first found it to be undisputed that the State had by then "removed [the plaintiff's] name from the Perpetrators List (sic) [in the central registry] and acknowledged his right to a hearing," thereby mooting the claim for immediate injunctive relief. The master then recommended that an evidentiary hearing be held to determine entitlement to damages and attorney's fees. He concluded there was "no fair basis for the State's claim of qualified [immunity] and incorporate[d] the authorities cited by the plaintiff in support of this conclusion. *Tilton v. Dougherty*, 126 NH 294 (1985)."

Although all of the court's rulings adopting the master's recommendations would normally be treated as interlocutory, the federal courts regard the denial of a summary judgment motion's claim of qualified immunity under § 1983 as a final determination immediately appealable under the collateral order doctrine of *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 546 (1949). *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). This treatment reflects the nature of qualified immunity as "an *immunity from suit* rather than a mere defense to liability [, which is] effectively lost if a case is erroneously permitted to go to trial." *Id.* at 526 (emphasis in original). We have followed *Mitchell* in accepting the State defendants' appeal from the order denying their motion for summary judgment, and the principal issue before us is whether

the State defendants are entitled to qualified immunity as a defense to the prayer for damages under § 1983.

■ The doctrine of qualified immunity is a creature of federal law, as to which our holding in *Tilton v. Dougherty*, 126 N.H. 294, 493 A.2d 442 (1985), is irrelevant. The doctrine is understood to provide an affirmative defense that may be pleaded in either of the following types of actions brought to redress violations of interests protected under the National Constitution: (1) a constitutional tort action against a defendant alleged to have acted under color of federal law, of a sort recognized on the theory of *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971); *see Harlow v. Fitzgerald*, 457 U.S. 800 (1982); or (2) a statutory action against a defendant said to have acted under color of State law to violate a plaintiff's right, privilege, or immunity secured by the National Constitution and laws, which may be maintained under § 1983, *see Davis v. Scherer*, 468 U.S. 183, 190 (1984); *Harlow v. Fitzgerald supra*. In a case of either variety, qualified immunity may be raised as a defense to a claim against a governmental official for money damages. *See Harlow v. Fitzgerald, supra* at 818 n.31.

■ Under the doctrine, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory and constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, supra* at 818 (citations omitted). On this test of "objective reasonableness," *Harlow v. Fitzgerald, supra* at 818, a defendant is entitled to immunity unless his actions violated "legal norms . . . clearly established at the time of the challenged actions," *Mitchell v. Forsyth, supra* at 528, a standard that ignores a defendant's subjective state of mind, *Davis v. Scherer, supra* at 191, and renders inquiries into alleged malice irrelevant. In the absence of clearly established law, an official is not expected to anticipate how courts will later illuminate the law's grey areas, *Borucki v. Ryan*, 827 F.2d 836, 838 (1st Cir. 1987) (citing *Procunier v. Navarette*, 434 U.S. 555, 565 (1978)); *see Harlow v. Fitzgerald, supra* at 818, whereas clear law at the relevant time will preclude immunity unless an official can demonstrate extraordinary circumstances that could be said to have relieved him of responsibility to know the law's content, *Harlow v. Fitzgerald, supra* at 819.

The difficulty in applying this standard of reasonableness comes in identifying the degree of specificity with which the law must have been "clearly established" at the time of the official action.

*Anderson v. Creighton*, 107 S. Ct. 3034, 3038 (1987). And where the law in question is said to derive from a term whose meaning has been given the spacious breadth of due process, the issue of what officials can reasonably be expected to know can be difficult to resolve. As the following discussion will show, for example, we can say that the abstract notion of due process as including rights to some sort of notice and hearing is no help in identifying the particular interests that due process protects. *Board of Regents v. Roth*, 408 U.S. 564, 569–72 (1972). At the other extreme, however, defendants can hardly demand that the precise actions in question must previously have been held to implicate procedural due process, lest the immunity become virtually plenary. *See Anderson v. Creighton, supra* at 3039. The most, perhaps, that can be said in the abstract is that "[t]he contours of the [plaintiff's] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton, supra* at 3039.

We recognize, of course, that the references in these immunity cases to law, norm and plaintiff's right are to the law at the time the defendant is alleged to have acted, and the determination that a court must reach about the state of that law is not equivalent to a ruling about the sufficiency or insufficiency of the plaintiff's complaint in stating a cause of action under § 1983. *Mitchell v. Forsyth*, 472 U.S. at 528; *Mendez-Palou v. Rohena-Betancourt*, 813 F.2d 1255, 1259 (1st Cir. 1987). Thus, a complaint might be held to state a claim for relief even though the law was uncertain at the time the defendant acted, and a complaint could charge the violation of law clearly established at the time the defendant acted without necessarily alleging all elements necessary to entitle the plaintiff to relief for a denial of procedural due process. *See Codd v. Velger*, 429 U.S. 624 (1977). Nonetheless, inquiries into immunity and into the sufficiency of a complaint obviously overlap considerably, and a complaint that clearly fails to state a claim need hardly be the subject of a subtle enquiry into qualified immunity. A pretrial determination of qualified immunity, therefore, properly begins with an examination of the plaintiff's pleadings.

Insofar as it concerns the § 1983 action, count I of the complaint now before us pleads facts essentially as we have stated them above, and includes allegations that the central registry's reference to the plaintiff as a sex abuser caused the loss of his job and effectively prohibited him "from working within his profession." The laws, regulations, and policies providing for such a listing without notice and hearing are said to violate fourteenth amendment due process

on their face. Count II incorporates the preceding allegations and concludes that the listing defamed the plaintiff, attached a badge of infamy to his name, otherwise damaged his reputation, and thus infringed a liberty interest in the absence of due process. Count III incorporates the allegations of count I and charges that in causing the termination of the plaintiff's employment, and in limiting his opportunity to seek other professional employment, the defendants violated property interests likewise subject to federal due process protection.

■ Since we see no value in analyzing the counts separately, we will synthesize the three to produce combined statements of claims that are as favorable as possible to the plaintiff. In so doing, we must reject the suggestion, seemingly inherent in pleading job loss and denial of work opportunity in count III separately from the defamation and stigma pleaded in count II, that the latter standing alone are infringements of liberty interests subject to federal due process protection. Because, rather, it is settled law that personal reputation is neither a liberty nor a property interest cognizable under the fourteenth amendment, *Paul v. Davis*, 424 U.S. 693, 706 (1976), we combine the references to stigma and defamation with the other allegations of substantive loss, to produce the following two claims of official action under color of State law by or on behalf of the various State defendants, in derogation of the plaintiff's right to procedural due process:

A. Infringement of a liberty interest by stigmatizing the plaintiff through his central registry classification as a sex abuser, with the effect of barring him from employment as a social worker in any child care agency subject to State licensing.

B. Infringement of a property interest by causing the plaintiff to be discharged from nongovernment employment in such a way as to defame him and damage his reputation among those to whom information from the central register was published.

(Although in pure theory a third claim might be arguable, we ignore it here because on the facts as pleaded it would, at best, be entirely duplicative of the first. Discharge, at least of a public employee, may infringe a protected liberty interest when effected or caused by someone acting under color of State law and when accompanied by published charges that "seriously damage [a plaintiff's] standing and associations in his community." *Board of Regents v. Roth,*

408 U.S. at 573. In this case, however, the publication of the plaintiff's offender classification was addressed, not to the public, but only to those with access to the central registry, among whom the plaintiff has alleged no damage to standing or associations beyond the disqualification for professional employment as charged in the first claim set out above.)

With respect to that first claim, of stigma barring professional employment, the trial court correctly rejected the immunity defense. At the time of the defendants' acts, two sources of federal authority had been synthesized and explained with sufficient clarity to provide notice that an individual had a liberty interest cognizable under the fourteenth amendment, and § 1983, in continuing to pursue an occupational calling that he has theretofore exercised, which interest the government and its agents might not extinguish by the imposition of a stigma or disqualification in the absence of notice and hearing prior to the government's action.

Although the opinion in *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), spoke of substantive protection of an individual's right to pursue a common calling, and *Schware v. Board of Bar Examiners*, 353 U.S. 232, 238–39 (1957), recognized substantive limits on the government's right to exclude an applicant from professional or other occupations, the sources of the procedural protection in issue here may be discerned more readily in two later cases. *Cafeteria Workers v. McElroy*, 367 U.S. 886 (1961), was an action grounded in fifth amendment due process to compel federal officials to allow the plaintiff to resume work in a naval gun factory as a cook employed by an independent contractor, following termination of her employment at that location in accordance with the employer's agreement with the Navy to employ only those who met security requirements at the plant. Although the Navy had revoked the plaintiff's security clearance, and her employer had removed her from her job at the plant, the Navy had given her neither any reasons for revoking her clearance nor any opportunity to respond to whatever those reasons might have been.

While relief was denied on the ground that the Navy had acted in its proprietary capacity to manage internal operations, the Court obliquely suggested that some notice and hearing would be required before the government denied an individual the right to work for a nongovernmental employer if the disqualification resulted from the exercise of governmental power to regulate "an entire trade or profession, or to control an entire branch of private business. . . ." *Cafeteria Workers, supra* at 896. In equally

suggestive dictum, the court observed that the government in the case before it had not "operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity." *Cafeteria Workers, supra* at 898.

*Cafeteria Workers* is now seen as a preface to *Wisconsin v. Constantineau*, 400 U.S. 433 (1971); *see Paul v. Davis*, 424 U.S. at 702-07, in which the plaintiff sued under § 1983 for damages and injunctive relief on the theory that local officials acting under a State statute had deprived her of protected interests without procedural due process, when they publicly posted her name as a person to whom liquor could not be sold or given, due to her excessive drinking and its resulting social detriment. *See Constantineau v. Grager*, 302 F. Supp. 861 (E.D. Wis. 1969), *aff'd.*, *Wisconsin v. Constantineau*, 400 U.S. 433 (1971). The Supreme Court affirmed the district court's ruling that due process required prior notice and hearing, reasoning that "where the State attaches a 'badge of infamy' to the citizen, due process comes into play," *Wisconsin v. Constantineau*, 400 U.S. at 437 (citing *Wieman v. Updegraff*, 344 U.S. 183, 191 (1952)). This reasoning was then generalized into a rule that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. at 437.

Although *Constantineau*'s expansiveness was seemingly affirmed by the quotation of this very language in the leading case on liberty interests subject to due process protection, *Board of Regents v. Roth*, 408 U.S. at 573, retrenchment was soon to follow. Six years after *Roth*, the Supreme Court decided *Paul v. Davis*, 424 U.S. at 693, which, as we have noted before, rejected reputation *per se* as a protected liberty interest, despite the language in *Constantineau* and *Roth* that had intimated otherwise. *Paul* is equally instructive for our purposes, however, in explaining the scope of *Constantineau*:

> "We think that the . . . language in the last sentence quoted, 'because of what the government is doing to him,' referred to the fact that the governmental action taken in that case deprived the individual of a right previously held under state law—the right to purchase or obtain liquor in common with the rest of the citizenry. 'Posting,' therefore, significantly altered her status as a matter of state law, and it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards."

*Paul v. Davis*, 424 U.S. at 708–09. The Court thus equated the *Constantineau* plaintiff's status, as a person entitled under State law to purchase liquor in common with the rest of the citizenry, with the status of individuals who have specifically been granted rights cognizable as liberty, such as the right to drive, recognized in *Bell v. Burson*, 402 U.S. 535 (1971), and the right to go at large on parole, which was held subject to due process protection in *Morrissey v. Brewer*, 408 U.S. 471 (1972):

> "In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment."

*Paul v. Davis*, 424 U.S. at 711.

■■ As thus explained by *Paul*, *Constantineau* is in point for the present case. A right or status subject to protection as liberty need not be derived from an express or affirmative grant to a § 1983 plaintiff, as happens when a driver is licensed or a prisoner paroled, but exists as a legally recognized eligibility to engage in an activity open to people generally or at least to a class of some size. *Cf. Medina v. Rudman*, 545 F.2d 244 (1st Cir. 1976), *cert. denied*, 434 U.S. 891 (1977). There is, therefore, no reason to question that the plaintiff enjoyed such a status as a person qualified by education and experience to practice social work on the staff of institutions for the care of children, and no reason to doubt that the status was effectively eliminated by listing his name as that of a perpetrator of sexual abuse, thereby rendering him unemployable in any such institution licensed in New Hampshire. Since the plaintiff's status was thus a protected liberty interest, it was a violation of procedural due process to extinguish it without giving him prior notice of the intended action and the opportunity for a hearing to contest it. *See Board of Regents v. Roth*, 408 U.S. at 574.

■ The law being clear, the only remaining question under the immunity doctrine is whether it was clear when the State defendants performed their personal or vicarious acts. *Paul v. Davis*, it will be remembered, was decided in 1976; the plaintiff was listed in the central registry in 1984. Thus, the law on which the plaintiff rests his claim was "clearly established" long before

the State defendants took their actions, and their presumptive knowledge, *see Borucki v. Ryan*, 827 F.2d at 838, of the *Constantineau-Roth* standards, as clarified in *Paul*, bars them from sustaining their claim of qualified immunity to the first cause of action, for violating a liberty interest.

As against this conclusion, the State defendants have raised only two arguments. First, they have sought to persuade us that the law was unsettled until this court decided *Petition of Bagley*, 128 N.H. 275, 513 A.2d 331 (1986), holding that prior notice and hearing are required before an individual's name may be included in the central registry. *Id.* at 286–87, 513 A.2d at 339–40. *Bagley*, however, is not in point. It rests entirely on the State Constitution, the clarity or opacity of which does not limit the protection that may be claimed under the fourteenth amendment and § 1983, *see Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541 (1985), whereas the relevant federal law construing the applicability and requirements of fourteenth amendment due process was clear long before *Bagley* was decided, and before the events in issue here took place.

The State's second argument rests on *Eftekhara v. Ill. Dept. of Children & Fam. Serv.*, 661 F. Supp. 522 (N.D. Ill. 1987), which ruled on a procedural due process claim brought by a teacher who had been fired by a provider of child care licensed by the State. The plaintiff's private employer had terminated her employment in compliance with a State statute requiring a licensee to discharge any such teacher charged with child abuse, upon commencement of a State investigation into the allegations. The district court held that the State's post-deprivation appeal procedures were adequate to satisfy due process in view of the public interest in protecting children, 661 F. Supp. at 528, a result that the present defendants urge us to reach here.

Three distinctions, however, remove our case from the ambit of *Eftekhara's* rationale, whatever its merits may be. The *Eftekhara* court could view the preclusion from employment, at least initially, not as purporting to rest on any final determination that the complaint was justified, but as grounded on the need for prompt action. Such, indeed, is a necessary and appropriate consideration in deciding how the due process balance should be struck between the competing interests that include the interests of potential victims. *See Harlow v. Fitzgerald*, 457 U.S. at 816.

In our case, however, there is not a scintilla of evidence to justify the State defendants' action as a measure taken promptly to protect potential victims; nine months went by after State officials first became aware of the incident in question before the State

defendants took any action to list the plaintiff's name in the central registry. Nor could the register listing be treated at any time as indicating merely that an investigation was under way. It reflected a final determination that the plaintiff was an abuser, with a resulting permanent exclusion from his chosen employment.

Finally, the State defendants can hardly be heard to argue that post-deprivation remedies should suffice, since post-deprivation remedies were never offered. Moreover, we view *Constantineau* and *Roth* as requiring notice and hearing in advance of the listing, for the very reason that the listing effected a permanent disqualification from professional work. At the same time, however, it may be worth emphasizing that we do not in any way suggest that the requirements of notice and full hearing preceding morally stigmatizing acts of official disqualification bar the State from promptly removing anyone reasonably suspected of child abuse from a position furnishing the opportunity for harm to others. A State employee or an employee of a child care agency subject to State regulation may be suspended on summary process long enough to permit a prompt investigation followed by notice and hearing, without violating due process. *See Harlow v. Fitzgerald*, 457 U.S. at 816.

As to the second claim, that the State defendants violated the plaintiff's property interest in his job with Teen Haven, we hold that the immunity claim should have been recognized, for at the time of the defendants' action it was uncertain that the Supreme Court would recognize an interest in particular private employment as a subject of due process protection. The uncertainty, indeed, persists to this day.

To be sure, a reading of *Roth's* now-classic description of property interests subject to due process protection would not necessarily raise a question about its application to a privately employed individual's interest in his job, as against government action requiring his private employer to discharge him.

> "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.
> . . .
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem

> from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

*Board of Regents v. Roth*, 408 U.S. at 577. There is, however, an ambiguity inherent in this formulation, for it fails to explain whether the "entitlement" necessary to qualify an interest as protected property must be enforceable directly against the government by means of a contract action or a statutorily created remedy, or whether, on the other hand, a plaintiff has an "entitlement" so long as it may be enforced against someone.

Given this uncertainty, it is noteworthy that the plaintiff has not cited us to any case in which the Supreme Court has held or indicated that a private employment relationship can meet the test of a protected property interest. *Roth* itself, of course, considered a public employee's claim, and, for examples of employment relationships that would be treated as protected property, the Court referred only to public employees with tenure or employees under government contracts with unexpired terms. *Roth*, 408 U.S. at 576–77. Contemporaneously with *Roth*, *Perry v. Sindermann*, 408 U.S. 593 (1972), recognized the possibility of a legally significant *de facto* tenure policy, but only in the context of a public teaching position, 408 U.S. at 599–602, and in the more recent case of *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, it was again in the context of public employment that the Court held that a statute forbidding dismissal without cause created a protected property right. 470 U.S. at 538–41.

It may, of course, be mere coincidence that these leading cases on protected property interests in employment deal solely with employment by a public, governmental employer, but they do nothing to resolve *Roth*'s ambiguity in a way that would support the plaintiff's claim. Nor does the plaintiff get any help from the holding in *Paul v. Davis*, 424 U.S. 693, that the protection of a personal interest by means of a State tort remedy is not an adequate reason to treat the interest as fourteenth amendment property. The fact, then, that State law provides redress for third-party interference with a contractual relationship by means of a remedy in tort, *see Montrone v. Maxfield*, 122 N.H. 724, 449 A.2d 1216 (1982), furnishes no certain basis to treat a private contractual relationship as property subject to federal due process protection, and *Paul* leaves *Roth*'s ambiguity unresolved.

Although we have not ourselves attempted to canvas the body of lower federal court cases on this point, two recent decisions from courts of appeal indicate the uncertainty of a claim to protected

property in private employment. In *Stein v. Board of City of New York,* 792 F.2d 13 (2d Cir.), *cert. denied,* 479 U.S. 984 (1986), a driver employed by an independent school bus contractor was held to have a property interest subject to due process protection against the government, by virtue of his private contract providing that he could be discharged by the bus company only for cause. The court's cited authority for this proposition, however, was a discussion in a previous case dealing with a public employee's liberty interest in freedom from stigma disqualifying him from further employment. *Id.* at 15–17. The even more recent case of *Merritt v. Mackey,* 827 F.2d 1368 (9th Cir. 1987), drew a conclusion similar to *Stein's,* but did so on the basis of at least questionable authority, citing *Greene v. McElroy,* 360 U.S. 474 (1959), which was decided before *Roth* and on non-constitutional grounds. 827 F.2d at 1370. A vigorous dissent, citing *Paul v. Davis, inter alia,* further underscores the uncertainty of the majority position. *Merritt v. Mackey, supra* at 1374–80 (Wallace, J., dissenting); *see also Eftekhara v. Ill. Dept. of Children & Fam. Serv.,* 661 F. Supp. at 526–27 (no protected property because plaintiff not a tenured public employee). The plaintiff thus relies on questionable law for his property claim, and the law that is uncertain today was no less so in 1984. Because there was no law clearly recognizing a fourteenth amendment property interest in private employment at the time the defendants acted, immunity should have been recognized on the property claim.

At this point the plaintiff falls back to the position that the responsibilities of two of the State defendants were insufficiently discretionary to entitle them to claim immunity, so that only the others may raise the defense. We decline so to limit the summary judgment on remand, however, for we are satisfied on another ground that the complaint fails to state any cause of action under § 1983 for violating a property interest.

██ We refer again to *Roth*'s description of a property interest as necessarily resting on a claim of entitlement, as distinguished from abstract need or desire, or unilateral expectation. *Roth,* 408 U.S. at 577. When the government is a contracting party to an employment agreement, as we have seen, statutory or contractual provisions for tenure or term may provide a basis to claim entitlement, *Roth, supra* at 576–77, as will a statutory requirement of good cause as a condition precedent to discharge, *Cleveland Board of Education v. Loudermill,* 470 U.S. at 538–39. An employee at will, however, can claim no such entitlement. *Bishop v. Wood,* 426 U.S. 341 (1976). Hence, an allegation of some status or relationship with greater protection than at-will employment is

necessary in order to claim a property interest in employment cognizable under § 1983. This requirement is fatal to the property violation claim now before us.

Nowhere does the plaintiff plead any statutory enactment, or any express or implied contractual provision that would have given him a colorable claim of entitlement to continued employment. On such matters as term, tenure, or any requirement of cause for dismissal, the complaint is silent, and in the volumes of material submitted to us in appendixes to briefs and the notice of appeal we have come upon only one reference bearing on the matter of entitlement. That reference confirms that the plaintiff had none.

In the memorandum accompanying his own motion for partial summary judgment, the plaintiff argued that he had a protected property interest in his job because even an employee at will has a right to expect he will not be fired for reasons "against public policy," citing *Cloutier v. A & P Tea Co., Inc.*, 121 N.H. 915, 436 A.2d 1140 (1981) and *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974). The memorandum then identifies the public policy violated by firing him as a policy against violating due process. That is, he argues that he had a property interest in his job subject to due process protection because firing him without hearing would violate due process. This is circularity, pure and simple, and it will never get the plaintiff to a source of entitlement in State law.

We should also add that this reasoning would be subject to rejection on the further ground of its insupportably broad-brush treatment of the cited cases. The so-called *Monge* rule, as it has evolved through *Howard v. Dorr Woolen Company*, 120 N.H. 295, 414 A.2d 1273 (1980) and *Cloutier*, provides a remedy for the discharge of an at-will employee who can show that he was fired because of his employer's bad faith, malice, or retaliation, *Cloutier, supra* at 921, 436 A.2d at 1143, and because he performed an act that public policy would encourage or refused to do something that public policy would condemn, *Cloutier, supra* at 922, 436 A.2d at 1143. The remedy provided, however, is one against an employer, whereas the plaintiff has not alleged any basis for invoking the rule against Teen Haven so as to raise a colorable claim that he was entitled not to be fired. The plaintiff alleges only that Teen Haven discharged him, not because of what he had done or failed to do for Teen Haven, but because the State had classified him as a sex abuser, whom Teen Haven was forbidden to employ. Even if for some reason Teen Haven were to be treated as identical with the State defendants, the plaintiff would still be without any basis to claim "entitlement" derived from a remedy under *Cloutier*. The

only reason alleged or suggested for the State's action against the plaintiff was his admitted act of French-kissing the juvenile for whom he had responsibility as a social worker. However that act may be described, no one could reasonably treat it as an act that public policy approves. That being the case, the plaintiff could not possibly have a claim under *Cloutier.*

In sum, the plaintiff fails to state any claim under § 1983 for deprivation of a property interest in violation of due process, and summary judgment should be entered in favor of all the State defendants on the property claim.

*Affirmed in part; reversed in part; remanded.*

All concurred.